# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES A. TANKSLEY,

                              Plaintiff,

        v.                                              OPINION & ORDER

JON E. LITSCHER, BRIAN FOSTER, and                      15-cv-126-jdp
WISCONSIN DEPARTMENT OF
CORRECTIONS,

                              Defendants.

Pro se plaintiff James A. Tanksley is a prisoner at the Waupun Correctional Institution (WCI), where he is serving a long sentence for sexual assault of a child. He practices the Hermetic Order of the Golden Dawn, which WCI recognizes as a legitimate religious faith. Practice of the Golden Dawn, like other occult religions, requires the use of tarot cards. Tanksley would like to acquire a specific tarot deck, the Initiatory Tarot of the Golden Dawn. But WCI officials won't let Tanksley have the Initiatory Tarot because some of the cards depict nudity in a realistic, eroticized way. Defendants contend that the Initiatory Tarot is a threat to the security of the prison and an impediment to Tanksley's rehabilitation as a sex offender. WCI allows inmates to have other tarot decks, but Tanksley is not satisfied with those because they do not have symbolism specific to the Golden Dawn, and even if they did, Tanksley prefers the Initiatory Tarot version.

Tanksley contends that barring him from having the Initiatory Tarot violates his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), and under Free Exercise Clause of the First Amendment. Defendants are the

Wisconsin Department of Corrections, its secretary Jon Litscher, and WCI warden Brian Foster.

Tanksley's case illustrates a fundamental tension under RLUIPA. On one hand, RLUIPA accords significant deference to the inmate's choice of religious exercise, which may be restricted only to serve a compelling government interest, and then only by the least restrictive means available. On the other hand, courts defer to the expertise of prison officials in matters of security and rehabilitation. So, the question here is whether Tanksley's religious preference for an erotic tarot deck must yield to the judgment of prison officials that such a tarot deck is disruptive contraband that should be banned. For reasons explained in this opinion, I conclude that RLUIPA does not require defendants to allow Tanksley, a convicted child sex offender, access to the erotic Initiatory Tarot, even if that tarot deck is part of a religious exercise. If Tanksley's RLUIPA claim fails, his Free Exercise claim necessarily fails, too. Defendants' motion for summary judgment, Dkt. 46, is granted.

UNDISPUTED FACTS

I draw the following facts from the parties' summary judgment materials. The facts are undisputed except where noted.

In 2001, plaintiff James A. Tanksley was convicted of two counts of first-degree sexual assault of a child and one count of false imprisonment in Langlade County Circuit Court. These charges arose out of two incidents in 1996 and 1997 in which Tanksley sexually assaulted a nine-year-old boy and, in one incident, locked the door to prevent the boy from leaving. Tanksley received two consecutive 40-year sentences for the sexual assaults and a two-year consecutive sentence for the false imprisonment. He will be required to register as a sex offender

for the rest of his life. The DOC's psychologist chief, Jonathan Dickey, determined that Tanksley has an above-average risk of recidivism. Tanksley disputes the risk assessment. Tanksley says that he lived with a lover for more than two years, which, if true, is a consideration that would reduce his risk of recidivism to average. Dickey recommended that Tanksley complete an intensive residential sex offender program for high-risk sex offenders. Tanksley is on the waitlist for this program and has not yet completed any sex offender treatment, which is typically provided for those nearing release.

Throughout his incarceration, Tanksley has been a practicing believer in the Hermetic Order of the Golden Dawn. WCI and the DOC recognize the Golden Dawn as a legitimate faith, and they have categorized it within the Pagan umbrella religious group. In 2011, Tanksley submitted a form DOC 2075, "Request for New Religious Practice," to ask that he be allowed to acquire at his own expense the Initiatory Tarot of the Golden Dawn by Giordano Berti, a tarot card deck with a companion booklet. He explained in his 2011 request that he is a member of the Golden Dawn and that the Initiatory Tarot "is the only Tarot deck codified for the Golden Dawn religion." Dkt. 50-5, at 1. Chaplain Sam Appau recommended denying Tanksley's request because the Initiatory Tarot deck contains images of violence and nudity. Other WCI and DOC officials concurred and denied Tanksley's request on the grounds that the Initiatory Tarot contained inappropriate nude images that would be deemed pornographic under prison regulations and that another tarot deck had been approved for inmate use. *Id*. at 2-3.

Tanksley renewed his request for the Initiatory Tarot in 2013 with another form DOC 2075. This time, Tanksley did not contend that the Initiatory Tarot was the *only* tarot deck approved for the Golden Dawn. Rather, he explained that the Initiatory Tarot is "one of the

newest approved Tarot Decks of the Golden Dawn Religion and is the most accurate in both symbology and imagery." Dkt. 50-6, at 1. Tanksley explained that the previously approved tarot deck is Wiccan and "does not contain the correct symbology/symbols/ colors/imagery and meanings as those used for the Golden Dawn Religion." *Id.*

Again the reviewing chaplain recommended denial. The essence of the chaplain's decision was that the Initiatory Tarot was not specifically required for the Golden Dawn. As the chaplain put it:

> I am not convinced by his indicated response and justification he provided to the question how initiatory tarot deck of the golden dawn is required to practice his chosen religious path. I get the impression that inmate Tanksley prefers the look and flavor of this new deck over the existing allowed deck of tarot cards not because it is a requirement but as a personal preference.

Dkt. 50-6, at 2. The chaplain also cited the logistical difficulties that would arise if the DOC had to cope with many inmate requests for specific tarot decks from among the many that are commercially available.

Tanksley's 2013 request (like his 2011 request) was also reviewed by Kelli Willard West, an administrative policy advisor in the DOC's Division of Adult Institutions. As part of her duties, West was also the chair of the DOC's Religious Practices Advisory Committee, which reviews inmate requests for new religious exercise, sets DOC policy on religious practices, and advises institutions on the proper handling of religious issues. By the time West reviewed Tanksley's 2013 request, the DOC had modified the approved religious property list to include three tarot decks: the previously approved Aquarian Tarot, the Animal Wise Tarot, and the Rider-Waite Tarot. The Rider-Waite Tarot was deemed to "have roots in the Golden Dawn tradition according to the Pagan [umbrella religious group] advisors." *Id.* at 4. West agreed

with the chaplain's view that allowing every inmate preference in tarot decks would pose logistical difficulties. West concurred with the denial of Tanksley's request.

At some point after Tanksley's 2013 request was denied, the DOC adopted a more flexible policy regarding requests for alternative tarot decks. Instead of being routinely denied based on the approved religious property list, each request is individually determined based on the inmates' own justification, available information about that tarot deck, and the advice of spiritual leaders. Dkt. 50, ¶¶ 39-40. Tanksley has not submitted a request under the new policy.

In connection with this litigation, West has reviewed the Initiatory Tarot deck. She states that she would maintain her recommendation to deny Tanksley's request on the grounds that 13 of the 78 cards include imagery that would be deemed pornographic under DOC regulations.

The Initiatory Tarot deck would not likely be considered "pornographic" under the common conception of the term. But some of the cards depict nude figures, rendered in full color in an eroticized style typical of some graphic novels. For example, here are two of the cards that the DOC finds objectionable:

 

Dkt. 74, at 1, 3.

At least some of the objected-to cards would fall within the definition of "pornography" used by the DOC. Division of Adult Institutions (DAI) policy 309.00.50 prohibits "inmates from possessing pornographic materials." Dkt. 50-1, at 1. Pornography is defined in this policy somewhat flexibly, through a list of non-exclusive examples. In pertinent parts, the definition provides:

> B. Pornography includes, but is not limited to:
>
> 2. Any material, other than written material, that shows any of the following:
>
>    b. Sadomasochistic abuse, including but not limited to flagellation, bondage, brutality to or mutilation or physical torture of a human being.

3. Any commercially published material that features pictures/drawings of nudity on a routine or regular basis.

    a. Publications shall not be prohibited solely because they display naked or partially covered buttocks.

    b. A publication shall not be prohibited solely because it contains pictorial nudity that has a medical, educational, or anthropological purpose.

    d. A publication that promotes itself based upon depictions of nudity in the case of individual one-time issues may be denied.

4. Any material showing nudity of any person who has not attained the age of 18, whether personal or commercially published pictures/drawings. Pictures/drawings of an infant or pre-pubescent child's chest are not considered breasts.

*Id.* at 2-3. Nudity means:

The showing of human male or female genitals or pubic area with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of the areola or nipple, or the depiction of covered male genitals in a noticeable state of erection.

*Id.* at 2. Similar definitions are provided in the Wisconsin Administrative Code. *See* Wis. Admin. DOC § 309.02.

The Initiatory Tarot contains no depictions of sexual activity or any lewd display of genitalia, the hallmarks of hard-core pornography outside the prison context. But some of the Initiatory Tarot cards plainly fall within the DIA's definition of pornography. Card VI is pornographic because it shows bondage; Card 0 because it shows a nude child, including his genitals. Eleven cards show nudity, mostly bare female breasts. Whether these eleven cards are pornographic under DIA policy is arguable, because it is not clear whether the Initiatory Tarot deck "features" nudity, as required under definition B.3. But the specific definitions are only

illustrative, so the DOC determination that the 13 objected-to cards are pornographic under prison regulations is a reasonable one.

## ANALYSIS

The court will focus on Tanksley's RLUIPA claim, because RLUIPA provides greater protection for religious liberty than the First Amendment itself. *See Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015). Thus, if Tanksley's RLUIPA claim fails, his free exercise claim under the First Amendment will necessarily fail, too. *Mark v. Gustafson*, 482 F. Supp. 2d 1084, 1090 (W.D. Wis. 2006).

But before turning to the RLUIPA issue, I address Tanksley's argument in his summary judgment opposition that the DOC definitions of "pornography" and "nudity" are overbroad and vague, and therefore the regulations based on these definitions violate his rights under the First and Fourteenth Amendments. This is actually a new claim for relief, which Tanksley did not include in his initial or amended complaint. I will not allow Tanksley to proceed on them now because defendants were not on notice that they had to defend claims based on Tanksley's rights to free speech or due process. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (purpose of the complaint is to give notice to defendant); Fed. R. Civ. P. 8. Tanksley has not asked to amend his complaint to add these claims, and if he had, I would deny the request because he brings it too late. Under Federal Rule of Civil Procedure 15, the court should freely give leave to amend a complaint when justice so requires, but not when there is "undue delay, bad faith, or dilatory motive" by the plaintiff or "undue prejudice" to the defendant. *Payne v. Churchich*, 161 F.3d 1030, 1036 (7th Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Allowing Tanksley to add new claims now, after defendants' motion for summary

judgment is fully briefed, would be highly prejudicial to defendants. One last comment on the topic: a free speech/due process claim would entail consideration of many of the same issues already at issue here, particularly the DOC's purpose for, and means of, restricting erotic material in its prisons. If Tanksley cannot establish his entitlement to such material for religious purposes under RLUIPA, it is unlikely that he could establish his entitlement to such material on general free speech grounds.

The essential principle of RLUIPA, as it applies to prisoners, is simple: any substantial burden on a prisoner's religious exercise is subject to review akin to strict constitutional scrutiny. As the pertinent part of the statutory text provides:

> (a) General rule
>
> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Another important part of RLUIPA is the broad definition of "religious exercise":

> The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

*Id.*, § 2000cc-5(7)(A).

Tanksley bears the burden of showing that the DOC's policies substantially burden his religious exercise. This means, at the threshold, that Tanksley's interest in the Initiatory Tarot

must be rooted in a sincere religious belief, rather than a purely secular interest, and that it is not merely a pose adopted to acquire material that would otherwise be banned. For purposes of summary judgment at least, defendants here do not dispute the sincerity of Tanksley's religious interest in the Initiatory Tarot. Tanksley also bears the burden to show that DOC's policies substantially burden his religious exercise. *See Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). If Tanksley makes this showing, then the burden shifts to defendants to show that the prohibition of the Initiatory Tarot is the least restrictive means of furthering a compelling governmental interest. *Id.*; *accord Holt*, 135 S. Ct. at 863.

To succeed on their motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in Tanksley's favor as the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If Tanksley fails to establish the existence of an essential element on which he will bear the burden of proof at trial, summary judgment for defendants is proper. *See Celotex*, 477 U.S. at 322. The defendants are also entitled to summary judgment if there is no genuine dispute that they have established the elements on which they have the burden.

## A. Substantial burden on Tanksley's religious exercise

Defendants contend that the prohibition of the Initiatory Tarot cannot be a substantial burden on Tanksley's religious exercise because he has practiced Golden Dawn while

incarcerated for 20 years without it. Thus, according to defendants, the prohibition of the Initiatory Tarot is merely an incidental burden, not a substantial one.

The concept of "substantial burden" is not expressly defined in the RLUIPA statute. The Supreme Court said that a substantial burden is one that forces a prisoner to "engage in conduct that seriously violates [his] religious beliefs." *Holt*, 135 S. Ct. at 862 (quoting *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2775 (2014)). Implicit in the concept of substantial burden, and in the Supreme Court's formulation, is the notion that there may be burdens on religious exercise that are indeed "insubstantial." But as the Seventh Circuit recognized after *Holt*, "The Supreme Court's formulation leaves a lot of uncertainty. How is a court to tell whether a given restriction 'seriously' violates or contradicts religious beliefs?" *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015).

In this case, defendants' best argument is developed in their reply brief, Dkt. 78, where they discuss the book that Tanksley cites as evidence of Golden Dawn doctrine: *An Introduction to the Golden Dawn Tarot*, by Robert Wang, published in 1978. (The book itself is Dkt. 69, although the entire book is not available on the electronic docket.) Tanksley cited the Wang book in his 2011 Request for New Religious Practice to support his claim that the Initiatory Tarot was the only deck suitable for the Golden Dawn. It is true that Wang wrote that only one deck "includes all of the correct attributions of a secret oral tradition" and that other decks feature "intentional obfuscation." *Id.* at 11, 12. But Wang was talking about a Golden Dawn Tarot deck that was available in 1978, a deck reproduced in its entirety in the book. Dkt. 69, at 52-61. The Initiatory Tarot deck was not published until 2008; it is therefore indisputably *not* the deck that Wang endorses. Defendants argue, rightly, that based on the Wang book, the 2008 Initiatory Tarot cannot be required for the proper practice of the Golden Dawn. This

argument mirrors the opinion of the chaplain who reviewed Tanksley's 2013 request and concluded that the Initiatory Tarot was not required by the Golden Dawn religion. Dkt. 50-6, at 2.

This would have been a very good argument under pre-*Holt* precedent, such as *Eagle Cove Camp & Conference Center, Inc. v. Woodboro*, 734 F.3d 673, 680 (7th Cir. 2013). Under that line of precedent, a substantial burden was "'one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Id.* at 680 (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (2003)). It seems reasonable for a prison official to ask whether a proposed religious exercise is a practice important to the inmate's professed religion or merely the inmate's preferred style of observance. Before *Holt*, in many courts this was a valid consideration in the substantial burden analysis. But this conception of "substantial" did not survive *Holt*, as the Seventh Circuit made clear in *Schlemm.* 784 F.3d at 364.

And such a conception of the substantial-burden analysis is difficult to square with the statutory text. By its textual terms, RLUIPA protects "religious exercise," not the exercise of the inmate's particular religion. RLUIPA defines "religious exercise" as "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(B) (emphasis added). Thus, under RLUIPA, the question is whether the specific proposed religious exercise is substantially burdened, not whether the religious exercise is one that could be prohibited without making it too difficult to practice that religion.[1] *Holt* reasoned

---

[1] Still, even after *Holt*, I find two circuit court decisions that have considered as part of the substantial burden analysis whether the contested religious exercise is required by the inmate's religion. *See United States v. Barnes*, 677 F. App'x 271, 277 (6th Cir. 2017) ("While . . . it is not the place of the court to decide the 'centrality of . . . beliefs to canonical texts,' that does not prevent this court from determining whether a particular practice is required by a religion as

from this definition to conclude that it does not matter whether the inmate has other means of practicing his religion, whether the inmate's religion actually compels the proposed practice, or whether the proposed practice is in the main stream of the religion. 135 S. Ct. at 862-63. Under *Holt*, RLUIPA protects every religious preference, no matter how idiosyncratic or how minor to the inmate's professed religion.

But still the question remains: what constitutes a substantial burden? If a prison official cannot at all consider the doctrine of the inmate's religion, even as the inmate describes it, then the only question is the nature of the prison's restriction of the inmate's religious exercise. Any outright prohibition of a requested religious practice would be a substantial burden. Restrictions on the time, place, and manner of the exercise may or may not impose a substantial burden. This is the approach taken in a well-reasoned post-*Holt* opinion of the Eleventh Circuit. "[C]ourts must accept a religious adherent's assertion that his religious beliefs require him to take or abstain from taking a specified action." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1144 (11th Cir. 2016). Instead, the question is "what the challenged law actually requires of the plaintiff." *Id.* The government imposes a substantial burden on a religious exercise when it (1) compels the plaintiff to forego his religious exercise; (2) prohibits the plaintiff from performing his religious exercise; or (3) presents the plaintiff with a "'choice' of incurring a 'serious' penalty or 'engag[ing]' in conduct that seriously violates [his] religious beliefs.'" *Id.* (quoting *Holt*, 135 S. Ct. at 862) (alterations

_____

part of the substantial-burden analysis . . . ." (quoting *Haight v. Thompson*, 763 F.3d 554, 567 (6th Cir. 2014))); *Oklevueha Native Am. Church of Hawaii, Inc. v. Lynch*, 828 F.3d 1012, 1016-17 (9th Cir. 2016) (finding inadequate evidence to support a finding of a substantial burden in a RFRA claim when the plaintiffs stated "in no uncertain terms" that the exercise at issue—possessing marijuana—was only a substitute for their religion's primary "sacrament," peyote).

in original). Just to be clear about where this leaves the substantial burden analysis: any prohibition of requested religious property will constitute a substantial burden on a religious exercise, thus placing the burden on the prison to justify that prohibition. I am not completely confident that Congress or the Supreme Court intended to go quite this far, but this is the destination to which *Holt* directs us.

I conclude that there is no genuine dispute—under post-*Holt* precedent—that defendants have substantially burdened Tanksley's religious exercise, even though his preferred tarot deck is not required by the Golden Dawn religion.

## B. Least restrictive means of furthering a compelling governmental interest

So the burden falls to defendants to demonstrate that prohibiting Tanksley from having the Initiatory Tarot is the least restrictive means of furthering compelling governmental interests. Defendants cite institutional security and Tanksley's rehabilitation as compelling interests.[2] Security is a compelling interest. *Cutter v. Wilkinson*, 544 U.S. 709, 725, n.1 (2005). Rehabilitation is a "valid penological objective" within the First Amendment context, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), and it has been recognized by district courts as a compelling governmental interest under RLUIPA. *See Levi v. William*, 07-cv-3228, 2007 WL 2893647, at *1 (C.D. Ill. Sept. 28, 2007); *Schnitzler v. Reisch*, 06-cv-4064, 2008 WL 895843, at *1 (D.S.D. Mar. 31, 2008).

But it is not enough for defendants to invoke security and rehabilitation in general terms. They bear the burden to show that compelling interests are served by the application of

---

[2] Defendants also cite two other potentially compelling interests: "reducing recidivism [and] crime prevention." Dkt. 78, at 5. But they made no separate arguments in support of these interests, and they are closely related to Tanksley's rehabilitation.

the anti-pornography prison regulations specifically to Tanksley, the particular inmate whose religious exercise is substantially burdened. *Holt*, 135 S. Ct. at 863 (citing *Hobby Lobby*, 134 S. Ct. at 2779). Defendants must also show that denying Tanksley an exception to the anti-pornography regulations is the least restrictive means of furthering the prison's compelling interests.

In *Hobby Lobby*, the Supreme Court described the least-restrictive-means test as an "exceptionally demanding" standard that requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby*, 134 S. Ct. at 2780. But in *Holt*, the Supreme Court also recognized the long-standing tradition of judicial deference to prison administrators' expertise. *Holt,* at 864. Long ago, in considering the First Amendment rights of pretrial detainees, the Court recognized that prison order and discipline are matters "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

*Holt* recognized these two competing principles, but the Court's opinion provides little guidance in how to harmonize them. As the Court put it:

> Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard. And without a degree of deference that is tantamount to unquestioning acceptance, it is hard to swallow the argument that denying petitioner a ½–inch beard actually furthers the Department's interest in rooting out contraband.

*Holt*, 135 S. Ct. at 864. The Court concluded that the justifications for prohibiting Holt from wearing a half-inch beard were so flimsy that prison officials were entitled to essentially no deference at all. *Holt* simply did not present a difficult question of how much deference is due prison officials' decisions. So I am left with this: defendants' decisions are entitled to respect but not unquestioning deference. With this general perspective in mind, I turn to defendants' justifications for prohibiting Tanksley from having the Initiatory Tarot.

I begin with the security concern. Defendants contend that if allowed, the Initiatory Tarot deck would be a unique item at WCI, particularly because it contains depictions of nudity. According to the declaration of the WCI security director, unique items "put the staff and inmates at risk . . . because inmates tend to trade them and misuse them . . . lead[ing] to theft, bartering, strong-arming, inmate exploitation, violence, and fights." Dkt. 52, ¶¶ 9-10. I conclude that this is a reasonable concern: because pornography is generally banned in Wisconsin prisons, the erotic illustrations in the Initiatory Tarot would make it particularly valuable, even among prisoners who had no religious interest in it. The potential for disruption and violence is a legitimate concern, and it is appropriate for the court to defer to prison officials on their prediction of whether the Initiatory Tarot poses that risk.

I am not persuaded by Tanksley's argument to the contrary. Tanksley contends that another Wisconsin inmate was allowed the Enochian Skrying Tarot of the Golden Dawn, which also included nudity, but it posed no security issues. This is the tarot deck at issue in *Meyers v. Burdick*, in which the Eastern District of Wisconsin found "genuine issues of material fact as to whether an outright ban on [the Enochian Skrying Tarot] is the least restrictive means of furthering the governmental interests in prison security and rehabilitation." No. 10-cv-1126, 2012 WL 4357428, at *6 (E.D. Wis. Sept. 24, 2012). But the depictions of nudity in the

Enochian Skrying Tarot are simply not as explicit and erotic as those in the Initiatory Tarot. Compare, for example, these two cards with similar subject matter:




The defendants have made a reasonable determination that the Initiatory Tarot contains images that are pornographic under prison regulations, and that introducing those images would pose a risk to the security and order of WCI, which is otherwise pornography-free. Removing the 13 offending images is not a viable option, because, as Tanksley agrees, an incomplete tarot deck does not satisfy Tanksley's religious needs. I conclude that defendants have shown that the prohibition of the Initiatory Tarot is the least restrictive means of furthering the institution's compelling interest in security.

I turn now to defendants' concern for Tanksley's rehabilitation. Defendants rely on the declaration of Jonathan Dickey, a licensed psychologist and the DOC's psychology chief, who states that viewing images of nude adults and children would "reinforce . . . deviant sexual behaviors" and therefore be detrimental to Tanksley's rehabilitation. Dkt. 51, ¶ 22. Defendants

do not spend much effort to buttress Dickey's highly conclusory opinions with data or other evidence. Ultimately, defendants' reason is founded on what they think is common sense. Dkt. 78, at 6. But as Judge Posner pointed out in *Payton v. Cannon*, 806 F.3d 1109, 1110-11 (7th Cir. 2015), the view that pornography is detrimental to rehabilitation and good order in prisons is an article of faith among prison administrators, but it is not consistently supported by good science. The Dickey declaration might be vulnerable to a robust challenge, but Tanksley has adduced no evidence to rebut Dickey's anodyne opinion that sex offenders should be kept away from pornography.

Tanksley argues that his rehabilitation is not defendants' real concern, because he has not yet received any sex offender treatment. But such treatment is typically provided as the inmate approaches his release, which for Tanksley is still far off. The nature and timing of sex offender treatment is a matter on which the court will appropriately defer to prison officials. Tanksley also contends that defendants have overstated his risk of reoffending, because they failed to recognize that he had lived with a partner for an extended period. But even if his risk of reoffending is, by one measure, merely average, his rehabilitation is still a compelling interest, even if his release is years away. *See* Dkt. 80 (Dickey supplemental declaration addressing his STATIC-99R score).

Tanksley's main argument is that Wisconsin prisons already allow images of nudity, in approved tarot decks and other materials. He contends that the images in art, medical, and religious books in the prison library are more explicit than those in the Initiatory Tarot. He supplies examples in Dkt. 65-4 and Dkt. 65-5. Tanksley contends that these depictions of nudity are not pornographic under prison regulations because they have medical, educational, or anthropological purpose. *See* DAI Policy 309.00.50 B.3.b. And, Tanksley argues, the same

regulation should exempt the 13 objected-to images in the Initiatory Tarot. Tanksley is correct that there are depictions of nudity accessible within WCI. But none of these materials are as explicitly erotic as those in the Initiatory Tarot. And the Initiatory Tarot includes images of bondage and nude children, which squarely fall within the definition of pornography used by the DOC.

Tanskley also points to the nudity in the now-approved Rider-Waite tarot deck. But the depictions of nudity in the Rider-Waite tarot deck are simple line drawings that are not as explicitly erotic as those in the Initiatory Tarot. For example:

 

I also note that the Golden Dawn tarot deck endorsed by Wang also depicts nudity in a stylized, non-erotic way that is poles apart from the Initiatory Tarot. The point is best made by comparing matching cards from those two decks:









Tanksley's argument that defendants already allow depictions of nudity falls flat because the objected-to images in the Initiatory Tarot have a level of erotic realism that is simply not

present in other tarot decks that the DOC has already approved, or in the tarot deck that Wang endorsed as the one appropriate for adherents of the Golden Dawn.

If I accord a measure of respect to defendants' conclusion that pornography is counter-therapeutic for sex offenders, defendants have shown that prohibiting Tanksley from possessing the Initiatory Tarot is the least restrictive means of furthering Tanksley's rehabilitative needs in this regard. They have not barred him from possessing a tarot deck, or even from possessing a tarot deck that is specific to the Golden Dawn. They have, instead, prohibited him from possessing a tarot deck that includes a realistic full-frontal view of a nude boy about the same age as the child he assaulted. I see no reason to question the opinion of the DOC's chief psychologist that allowing Tanksley to have this tarot deck, and particularly this image, would be detrimental to his rehabilitation.

Because defendants have shown that their prohibition of the Initiatory Tarot deck is the least restrictive means of furthering the government's compelling interests in security and Tanksley's rehabilitation, I will grant defendants' motion for summary judgment on Tanksley's RLUIPA claim. And for reasons given above, I will also grant defendants' motion for summary judgment on Tanksley's free exercise claim.

## ORDER

IT IS ORDERED that:

1. Defendants Jon E. Litscher, Brian Foster, and Wisconsin Department of Corrections' motion for summary judgment, Dkt. 46, is GRANTED.

2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered August 15, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge